**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| JAMES WILLIAM RILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 26-309-CFC-CJB |
| | ) | |
| TERRA TAYLOR, MICHAEL | ) | |
| RECORDS, BRIAN EMIG, | ) | |
| VITALCORE HEALTH STRATEGIES, | ) | |
| and FLORA ATANGCHO, | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**

Plaintiff James William Riley ("Plaintiff"), a prisoner incarcerated at the James T. Vaughn Correctional Center ("JTVCC") in Smyrna, Delaware, has filed a Complaint pursuant to 42 U.S.C. § 1983 ("Section 1983"). (D.I. 2) Defendants listed in the Complaint are: (1) Terra Taylor ("Taylor"), Commissioner of the Delaware Department of Corrections ("DDOC"); (2) Michael Records ("Records"), Bureau Chief of the DDOC; (3) Brian Emig ("Emig"), Warden of the JTVCC (and with Taylor and Records, the "State Defendants"); (4) VitalCore Health Strategies ("VitalCore"); and (5) Flora Atangcho ("Ms. Atangcho"), a medical practitioner (collectively, "Defendants"). Presently pending before the Court (among other pending motions) is Plaintiff's letter/motion seeking a preliminary injunction ("PI Motion"). (D.I. 11) For the reasons set out below, the Court recommends that the PI Motion be DENIED.[1]

I. **BACKGROUND**

Plaintiff filed his initial Complaint in this case on March 23, 2026. (D.I. 2) With the

---

[1] The instant Report and Recommendation will largely focus on the PI Motion, but will also address other motions that Plaintiff has filed as well.

Complaint, Plaintiff asserts against all Defendants a claim of deliberate indifference to a serious medical need, pursuant to the Eighth Amendment to the United States Constitution. (*Id*. at 3 & ¶ 2) On April 27, 2026, Plaintiff filed the PI Motion. (D.I. 11) That same day, the Court was referred this case by United States District Judge Colm F. Connolly to hear and resolve all pre-trial matters up to and including the resolution of case-dispositive motions. (D.I. 12)

Because of the nature of Plaintiff's allegations in the PI Motion (and even though the Complaint had not yet been screened), the Court thereafter ordered Defendants to file a response to Plaintiff's PI Motion on or before May 15, 2026. (D.I. 13) It also ordered the Clerk of Court to notify the DDOC and the Delaware Department of Justice ("DDOJ") of that order via electronic notification. (*Id*.) The State Defendants filed an answering brief regarding the PI Motion on May 15, 2026, (D.I. 17), and briefing on the PI Motion was completed on May 22, 2026, (D.I. 19).

On May 4, 2026, Plaintiff additionally filed a letter/motion seeking to amend the Complaint (the "first motion to amend"), in which he, *inter alia*, updates certain factual allegations regarding events that had occurred since the filing of the Complaint, and clarifies the nature of his current request for injunctive relief. (D.I. 14) Whether treated as a motion to amend pursuant to Federal Rule of Civil Procedure 15(a), or as a motion to supplement the pleadings pursuant to Rule 15(d) (or both), the Court GRANTS the first motion to amend, and will consider its allegations herein, in that doing so will help ensure a fuller record for resolution of the PI Motion and will allow all of Plaintiff's substantive allegations to be addressed herein.[2]

---

[2] On May 18, 2026, Plaintiff filed a document titled as a "[m]otion [i]n [l]imine[,]" (D.I. 18); to the extent that in this document Plaintiff sought a court order requiring that certain discovery be provided, or an evidentiary hearing be held, prior to a ruling on the PI Motion, (*id*.

2

On May 28, 2026, VitalCore and Ms. Atangcho filed a motion to dismiss the Complaint. (D.I. 21)   On June 22, 2026, Plaintiff filed a second motion to amend the Complaint ("second motion to amend").   (D.I. 26)   The Court will address the motion to dismiss and second motion to amend later in this Report and Recommendation.[3]

Any relevant factual background regarding the PI Motion will be set out in Section II.

## II.    DISCUSSION

The Court will first set out the relevant legal standards regarding a preliminary injunction.   Thereafter, it will discuss the merits of the PI Motion.

### A.    Legal Standards Regarding a Preliminary Injunction Motion

"Preliminary injunctive relief is an extraordinary remedy, which should be granted only in limited circumstances."   *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (internal quotation marks and citation omitted).   "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits,[4] that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in

---

at 5), the Court DENIES those requests, as it determines that the requested process at issue would not impact the outcome here and that in light of the issues discussed herein, the PI motion can be adequately decided on the written record.

[3]    On June 1, 2026, Plaintiff filed a motion to compel a ruling on the PI Motion, (D.I. 23), and a motion to compel a ruling on his first motion to amend, (D.I. 24).   On June 22, 2026, Plaintiff filed a second motion to compel a ruling on his PI Motion.   (D.I. 27)   The Court DENIES as MOOT each of these motions, in light of the issuance of the instant Report and Recommendation.

[4]    A likelihood of success on the merits means a reasonable chance, or probability, of winning; a "'likelihood' does not mean more likely than not."   *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011).

his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Shelley v. Metzger*, 832 F. App'x 102, 104 (3d Cir. 2020).

"[A] movant for preliminary equitable relief must meet the threshold for the first two 'most critical' factors: [he] must demonstrate that [he] can win on the merits . . . and that [he] is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) (footnotes omitted). "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* In assessing the four preliminary injunction factors, a court should consider that "[h]ow strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Id.* (internal quotation marks and citation omitted).

The moving party "bears the burden of producing evidence sufficient to convince the court that [the preliminary injunction factors weigh in favor of granting an injunction.]" *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987). "[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and . . . such discretion must be exercised consistent with traditional principles of equity[.]" *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006).

**B.      Analysis of the Merits**

In assessing the merits of the PI Motion, the Court will first set out the relevant facts of record.   It will then explain why Plaintiff's allegations do not indicate that he is likely to succeed with his Eighth Amendment claim, leading to the Court's recommendation of denial of the PI Motion.

**1.      Factual Background**

With his PI Motion, and as further articulated in Plaintiff's operative pleading(s), Plaintiff is requesting that the Court issue a preliminary injunction "directing the [D]efendants to . . . have a biopsy done[ on Plaintiff's prostate,]" in order to help determine whether Plaintiff has prostate cancer.   (D.I. 14 at 6-7, 9; *see also* D.I. 11)   Plaintiff "does not know whether or not he has prostate cancer[,]" (D.I. 2 at ¶ 1), and has never been diagnosed with prostate cancer, but he is concerned that he might have the disease, and is seeking the above relief to try to determine the answer.   Further relevant facts relating to this allegation are set out below.

Plaintiff is a 65-year-old man who is serving a natural life sentence; he has been incarcerated for the entire relevant period relating to this PI Motion, and during that time, he has received medical care relating to his prostate for at least many years.   (D.I. 2, ex. 1 at 18; D.I. 17 at 5; *id.*, ex. 1 at 23)[5]   VitalCore is alleged to be the medical provider with whom the DDOC has

---

[5]      When citing to documents that are a part of Exhibits 1 and 2 to D.I. 17, the Court will cite to ECF-generated page numbers.

5

contracted to provide medical care to inmates, including Plaintiff.[6]    (D.I. 2 at ¶ 10)[7]

Medical records indicate that in July 2020, October 2020, May 2021, and July 2022, Plaintiff was given a Prostate-Specific Antigen (or "PSA") test, which is a blood test that screens for prostate cancer or other health conditions by measuring a protein produced by the prostate gland.   (D.I. 17, ex. 1 at 23; *see* D.I. 2 at ¶ 6)   Plaintiff states that he also had PSA tests regularly from 2023 through 2026, and that these tests were reviewed by VitalCore medical personnel.   (D.I. 2 at ¶ 12)

On or around July 18, 2025, Plaintiff was given another PSA test, and the result from that test was a level of 5.1.   (D.I. 17, ex. 1 at 13)   Plaintiff appears to allege that he was not made aware of this test result in or around this time period.   (D.I. 2 at ¶¶ 6, 12)

Plaintiff then had another PSA test around October/November 2025, and the result there was a level of 10.7; Plaintiff was notified of the result by a medical provider on November 3, 2025.   (D.I. 2, ex. 1 at 18, 33; D.I. 17, ex. 1 at 12-13)   In or around this time period, Plaintiff alleges that a "Doctor Vida" "put him in for a[] consultation to be seen by a [u]rologist and to have a [b]iopsy done" on his prostate.   (D.I. 14 at 2; D.I. 2, ex. 1 at 18, 33)   On December 26, 2025, Plaintiff was seen by Dr. Michael Kennedy and Physician's Assistant ("PA") Amegbo Toffa; during the visit, Dr. Kennedy discussed with Plaintiff his recent "elevated PSA[,]" the fact

---

[6]    Unless otherwise noted, it appears that any of the medical providers referenced below are alleged to be associated in some way with Defendant VitalCore.

[7]    The medical records referenced below indicate that Plaintiff was seen by physicians for numerous other medical issues during the relevant time periods; herein the Court only focuses on those tests or visits relating to Plaintiff's prostate, in light of the nature of the allegations in the PI Motion.

that Plaintiff was having groin pain and other pain, and Plaintiff's upcoming appointment with a urologist. (D.I. 17, ex. 1 at 15-16) Plaintiff alleges that Dr. Kennedy, who is one of several people who determines whether or not to approve specialized medical care for a prisoner, did not approve him for a biopsy of the prostate at this time. (D.I. 14 at 2)

On December 31, 2025, the date Plaintiff had been scheduled for the above-referenced urology appointment at Beebe Urology, Defendant was transported to the wrong office; the appointment had to be cancelled as a result, and it was rescheduled to February 2026. (D.I. 2, ex. 1 at 29; D.I. 17, ex. 1 at 14) On January 8, 2026, a chronic care physician, Oluseyi N. Senu-Oke, reviewed Plaintiff's November 2025 PSA test results and other results; Dr. Senu-Oke described the 10.7 PSA test result as being at an "[e]levated" level. (D.I. 17, ex. 1 at 13) On January 13, 2026, Ms. Atangcho saw Plaintiff, discussed the new PSA test results with him, and reassured Plaintiff that he was scheduled for a urology appointment in February 2026. (*Id.* at 11-13)

The February 2026 appointment was cancelled as well, due to the fact that Beebe Urology had to close that day in light of inclement weather; the appointment was then rescheduled for April 2026. (*Id.* at 10) At some point in this time period, Plaintiff alleges that VitalCore and its medical staff, including Ms. Atangcho, refused to conduct any further blood tests on Plaintiff's PSA levels (though, as is noted below, a further such test was in fact later conducted). (D.I. 2 at ¶¶ 6-7, 13)

On April 16, 2026, Plaintiff had another PSA test, and the result was now a level of 5.0. (D.I. 17, ex. 1 at 9, 17) After having made various sick call complaints, (D.I. 2 at ¶ 16; D.I. 14 at 1; D.I. 14-2), on April 17, 2026, Plaintiff was again seen by Dr. Kennedy, (D.I. 14 at 1).

7

During the visit, Plaintiff said that he felt that certain symptoms he was experiencing (like pain in his groin or numbness in his feet) were due to his elevated PSA levels; Dr. Kennedy disagreed with Plaintiff on that score, and instead said that he thought (as had Ms. Atangcho) that these symptoms likely related to a back problem. (D.I. 14 at 1-2, 8) Otherwise, Dr. Kennedy discussed Plaintiff's PSA results with Plaintiff. Dr. Kennedy noted that Plaintiff had an "[e]levated PSA" and an enlarged prostate, that Plaintiff was "symptomatic[,]" that he had offered Plaintiff Flomax (which Plaintiff was "ready to try") and that Plaintiff was soon to be seen by urologists at Beebe Urology. (D.I. 17, ex. 1 at 3, 9) According to Plaintiff, at this time, Dr. Kennedy again did not approve him for a biopsy. (D.I. 14 at 2)

On April 29, 2026, Plaintiff was seen by Dr. Christopher F. Caputo at Beebe Urology. (D.I. 17, ex. 2 at 1; *see also* D.I. 14 at 1) Plaintiff reviewed with Dr. Caputo that: (1) his most recent PSA test showed a level of 5.0, but that his PSA was as high as 10.7 in the past; (2) he has significant lower urinary tract symptoms including urgency frequency, and that Flomax had not yet helped with those symptoms; and (3) he has no family history of prostate cancer. (D.I. 17, ex. 2 at 1) Dr. Caputo ultimately recommended that Plaintiff repeat a PSA test in three months and follow up with the office at that time. (D.I. 17, ex. 1 at 4; *id*., ex. 2 at 1, 6-7) Dr. Caputo did not do a biopsy, saying that no biopsy had been ordered. (D.I. 14 at 3) Ultimately, Dr. Caputo diagnosed Plaintiff with an elevated PSA level and with benign prostatic hyperplasia with lower urinary tract symptom (i.e., a non-cancerous enlargement of the prostate gland). (D.I. 17, ex. 2 at 6; *see also* D.I. 14 at 3)

Plaintiff next had a chronic care visit on May 1, 2026 with PA Toffa. (D.I. 17, ex. 1 at 1) During the visit, Plaintiff explained that he was "very irritated that he did not get a

8

bioposy" at Beebe Urology with regard to his prostate, as Plaintiff was concerned about the possibility that he could have prostate cancer. (*Id.* at 4) Mr. Toffa explained to Plaintiff that "Urology is on board, they are the specialist and we will go by their recommendations." (*Id.*) PA Toffa said that it is the urologist's decision as to whether or not to do a biopsy, not the decision of VitalCore staff. (D.I. 14 at 3) Mr. Toffa told Plaintiff that VitalCore would monitor Plaintiff's PSA levels and any problems with Plaintiff's prostate, and that a treatment provider will see Plaintiff every 90 days. (*Id.*) Plaintiff again disagreed with these statements, explaining his contrary view that a biopsy was the best course of treatment here, and that a biopsy was recommended in these situations by federal guidelines put out by the U.S. Centers for Disease Control and Prevention. (*Id.* at 4, 8)[8]

### 2.    Plaintiff Has Not Demonstrated a Likelihood of Success on the Merits

With the PI Motion and his pleadings, Plaintiff asserts that neither his "urologist, nor the [D]efendants have the authority to override [P]laintiff's [Eighth] Amendment rights . . . to have a [b]iopsy done[,]" and that Defendants' failure to order a biopsy for him amounts to a violation of those rights. (D.I. 14 at 8)

In order to make out an Eighth Amendment claim like this one, Plaintiff must show: (1) that he had a serious medical need; and (2) acts or omissions by federal officials that indicate deliberate indifference to that need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Stuart v. Pierce*, 587 F. Supp. 3d 127, 136-37 (D. Del. 2022). A "serious medical need" is one which has been "diagnosed by a physician as requiring treatment or one that is so obvious that a lay person

---

[8]    In his first motion to amend, Plaintiff also sought to add Dr. Kennedy and Mr. Toffa (whom Plaintiff sometimes refers to as "Taffo") as Defendants. (D.I. 14 at 9)

would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).   Deliberate indifference can be shown by a prison official "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle,* 429 U.S. at 104-05 (footnotes omitted). To demonstrate that a prison official was deliberately indifferent, a plaintiff must plausibly allege that prison officials knew of and "reckless[ly] disregarded a substantial risk of serious harm." *Stuart*, 587 F. Supp. 3d at 137 (alteration in original, internal quotation marks and citation omitted).   "[M]ere negligence" is not enough.   *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

The evidence of record here, whether it were considered in the light most favorable to Plaintiff, *see infra* at 14, or considered without such a gloss (as it would be in a preliminary injunction analysis), clearly fails to indicate that Plaintiff is likely to demonstrate an Eighth Amendment violation.   There may well be many reasons why this is so.[9]   But the reason the Court will focus on here, in that it applies to all Defendants, is that Plaintiff simply has not set out a possible claim under the Eighth Amendment to the effect that Defendants were deliberately indifferent to a serious medical need.

Importantly, in this regard:

> "[A] prisoner has no right to choose a specific form of medical treatment," so long as the treatment provided is reasonable. *Harrison v. Barkley,* 219 F.3d 132, 138-140 (2d Cir. 2000).   An inmate's claims against members of a prison medical department are not viable under [Section] 1983 where the inmate receives continuing care, but believes that more should be done by way of

---

[9]      (*See, e.g.*, D.I. 17 (State Defendants identifying multiple different reasons as to why a preliminary injunction should be denied and why a claim cannot stand as to them, and also asserting that the Court is without power to grant the type of relief requested); D.I. 22 (Defendants identifying multiple reasons why the claims against each of them should be dismissed))

> diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. *Estelle*[,] 429 U.S. at 107 . . . . Additionally, "mere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation. *See Spruill v. Gillis,* 372 F.3d 218, 235 (3d Cir. 2004) (citations omitted). Finally, prison administrators cannot be deliberately indifferent "simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." *Durmer v. O'Carroll,* 991 F.2d 64, 69 (3d Cir. 1993). "If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill*[,] 372 F.3d [at] 236 []. "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Id.* at 236.

*Hartmann v. Carroll*, 929 F. Supp. 2d 321, 328 (D. Del. 2013), *aff'd*, 582 F. App'x 111 (3d Cir. 2014); *see also Aliahmed v. Troxler*, Civ. No. 20-526-LPS, 2020 WL 3893229, at *3 (D. Del. July 10, 2020), *aff'd in part, dismissed in part*, 839 F. App'x 675 (3d Cir. 2021). Yet in this case, the record set out above clearly indicates that Plaintiff has been provided continuing care regarding his prostate, including: (1) receiving regular PSA tests; (2) seeing chronic care physicians and medical staff regularly to discuss those issues; and (3) seeing a urologist. The record is also clear that these medical professionals have not yet determined that a biopsy of Plaintiff's prostate is justified, with the result that no such professional has ever scheduled a biopsy for Plaintiff. Moreover, in the view of certain of Plaintiff's treatment providers, some of the symptoms that Plaintiff is experiencing—symptoms that Plaintiff thinks relate to his prostate, such as pain and numbness—are not in fact so related, and instead likely concern a back problem. For his part, Plaintiff simply disagrees with the judgment of his medical providers on these issues. He feels that more should be done by way of diagnosis and treatment than what

11

these providers have recommended.   As the caselaw discussed above indicates, this set of facts

does not sufficiently demonstrate that Defendants have exhibited deliberate indifference to a

serious medical need.   (D.I. 22 at 3 (Defendants noting that Plaintiff's allegations "are

insufficient as a matter of law to establish deliberate indifference" and that Plaintiff cannot

"parade his Section 1983 claim under the guise of medical malpractice"))

This resolution here is similar, for example, to the result in *Smith v. Gonzales*, No. 4:07-

CV-1322, 2007 WL 4343400 (M.D. Pa. Dec. 10, 2007).   In *Smith*, the plaintiff, a correctional

inmate who suffered from hepatitis C, sought a preliminary injunction with regard to his Eighth

Amendment claim that the defendants had delayed a liver biopsy for which he was approved; the

plaintiff sought an order for defendants to refrain from delaying him from being examined by a

liver biopsy specialist.   2007 WL 4343400, at *1.   A utilization review committee for the

plaintiff's correctional institution had recommended that the plaintiff receive the biopsy in

question; however, the biopsy had not been scheduled thereafter.   *Id.*   The plaintiff submitted

various requests that the biopsy be conducted, but the prison responded by indicating that such

procedures were scheduled based on various factors, and that the plaintiff's procedure would be

arranged in time.   *Id.*   After nearly two years had passed since the biopsy was first approved,

plaintiff filed suit.   *Id.* at *1-3.

The *Smith* Court denied the plaintiff's request for a preliminary injunction, finding that

the plaintiff had not shown a reasonable likelihood of success on the Eighth Amendment claim.

*Id.* at *1-2.   This was because the defendants had given medical care to the plaintiff and had

acted to address his liver-related medical condition—including providing him with quarterly

evaluation and routine testing, writing appropriate prescriptions, and approving the biopsy in

question.  *Id.* at *2.   The Court explained that "[g]iven the frequent medical care that [the plaintiff] admits he has received, the Court cannot conclude that the Defendants have been indifferent to his condition[;]" the fact that the plaintiff had not received the care more quickly could not "constitute cruel and unusual punishment."  *Id.* at *2-3.   The Court explained that even if the nearly two-year delay in scheduling the biopsy could constitute a basis for a state law medical malpractice claim, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner[.]"  *Id.* at *3 (quoting *Estelle*, 429 U.S. at 106).

Here too, as in *Smith*, a preliminary injunction is inappropriate, where Plaintiff is being provided with regular medical treatment and care, and where he simply disagrees with the choices made by his care providers (i.e., not to schedule a biopsy).   In light of this record, there can be no question that Plaintiff has failed to sufficiently demonstrate that Defendants were deliberately indifferent to a significant medical need.  *See also Aliahmed v. Troxler*, 2020 WL 3893229, at *2-3 (denying a request for a preliminary injunction as to an inmate's Eighth Amendment claims due to failure to show a likelihood of success on the merits, where the plaintiff wanted sex reassignment surgery expedited and wished to increase the dosage of a particular medication, but where the plaintiff was under the care of physicians, who believed that the current dosage of medication was appropriate, and who determined that no current referral for surgery was the right approach); *cf. Gonzales v. Subia*, No. 2:07-cv-01604-PMP-GWF, 2009 WL 1229843, at *3 (E.D. Cal. Apr. 29, 2009) (concluding, in rejecting a plaintiff's Eighth Amendment claim during the complaint screening process, that the "failure to perform a liver biopsy related to Plaintiff's disease of Hepatitis C does not constitute cruel and unusual punishment under the Eighth Amendment"); *Hartmann*, 929 F. Supp. 2d at 328 (granting a

13

motion for summary judgment as to an inmate's Eighth Amendment claim, where the plaintiff complained that he was not provided adequate medical care for his throat and thyroid conditions, but where, *inter alia*, the record reflected that he had received regular medical care for these conditions); *Jordan v. Delaware*, 433 F. Supp. 2d 433, 441 (D. Del. 2006) (granting a motion for summary judgment as to an inmate's Eighth Amendment claim, which was premised on prison officials' failure to provide him with a liver biopsy, where the plaintiff had received regular medical care and monitoring for his condition, and where the plaintiff's disagreement with the standards adopted by prison officials and medical staff at most amounted to a claim for medical negligence).

III.    CONCLUSION

For the foregoing reasons, the Court recommends that the PI Motion be DENIED. Additionally, the Court's decision would be the same even utilizing the legal standards applicable to the screening process set out in 28 U.S.C. §§ 1915(e)(2)(B) and 1915A (in that Plaintiff has failed to set out a plausible Eighth Amendment claim).   And so the Court also recommends that for the reasons set out herein, the Complaint, (D.I. 2), as amended, (D.I. 14), be DISMISSED.   *See, e.g.*, *Evans v. McKay*, Civil Action No. 20-1208-RGA, 2021 WL 2682708, at *5 (D. Del. June 30, 2021) (dismissing Eighth Amendment claims pursuant to screening, where the plaintiff's allegations indicated that he was not denied medical care, but that he was unhappy with the choice of medication that medical professionals had prescribed).   In light of

that, the Court also recommends that Defendant's motion to dismiss, (D.I. 21), be DENIED as MOOT.[10]

In light of Rule 15(a)(2)'s admonition that a plaintiff should be "freely giv[en] leave [to amend] when justice so requires[,]" Fed. R. Civ. P. 15(a)(2), and out of an abundance of caution, the Court further recommends that to the extent this Report and Recommendation is adopted, Plaintiff be given thirty (30) days from the date of adoption to file one further amended pleading (i.e., an omnibus pleading that contains all of Plaintiff's allegations in one document), and that should Plaintiff fail to do so, the Court close this case.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.   Parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).   The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court.   *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

Parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated March 7, 2022, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated:   July 6, 2026

Christopher J. Burke
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

---

[10]   Plaintiff's second motion to amend did not add substantive allegations to his prior pleadings; instead it largely asserted a right to certain types and amounts of damages regarding his previously-pleaded claim.   (D.I. 26)   In light of the Court's recommendations set out above, the Court further recommends that the second motion to amend be DENIED.